## IN THE UNITED STATES DISTRICT COURT FOR DISTRICT OF KANSAS

### Kansas City Division

_____
)
UNITED STATES OF AMERICA          )
)
        Plaintiff,          )
)  **Civil Action No 08-2272**
        v.             )
)
MAGELLAN PIPELINE COMPANY, L.P.,   )
)
        Defendant.        )
_____)

### CONSENT DECREE

A.     WHEREAS, Plaintiff the United States of America, on behalf of the United States Environmental Protection Agency (EPA), has filed a Complaint in this action concurrently with this Consent Decree, alleging that Defendant Magellan Pipeline Company, L.P. ("Magellan") is liable under Sections 311 and 309 of the Clean Water Act ("CWA") for eleven discharges of oil from a pipeline owned and operated by Magellan that occurred between May of 1999 and January of 2006.

B.     WHEREAS, the United States further alleges in the Complaint that Defendant is liable for violations of Section 311(j) of the CWA, 33 U.S.C. § 1321(j) with respect to Defendant's failure to prepare and implement Spill Prevention, Control and Countermeasure ("SPCC") Plans at its Coralville, Iowa terminal facility, and at its Roca, Nebraska terminal facility as required by 40 C.F.R. §§ 112 et. seq.

C.     WHEREAS, Defendant does not admit any liability to the United States arising out of the facts alleged in the Complaint.

D.     WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid

litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before taking testimony and without the adjudication or admission of any issue of fact or law except as provided in Section I, below, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 309(b), 311 (b)(7)(E) and 311(n) of the CWA, 33 U.S.C. §§ 1319(b), 1321(b)(7)(E) and 1321(n). The Court has personal jurisdiction over the Parties to this Consent Decree. Venue lies in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c), and 1395(a), because some of the discharges alleged in the Complaint occurred in, and Magellan conducts business in, this judicial district. For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction and to venue in this judicial district.

2. Notice of the commencement of this action has been given to the States of Arkansas, Illinois, Iowa, Kansas, Minnesota, Missouri and Nebraska, as required by Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## II.**APPLICABILITY**

1. The obligations of this Consent Decree apply to and are binding upon the United States, and upon Defendant, and any successors or assigns.

2. No transfer of ownership or operation of the Pipeline or any portion thereof, prior to the Termination Date, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of this Decree are implemented unless EPA agrees to the substitution of the new owner for the Defendant. Such

2

agreement will not be unreasonably withheld.  Any transfer of ownership or operation of any

portion of the Pipeline to any other person must be conditioned upon the transferee's agreement

to undertake the obligations required by Section V (Leak and Rupture Detection), Section VI

(External Force and Right of Way Management), Section VII (EPA Approval of Deliverables or

Compliance Methods) and Section VIII (Annual Reporting Requirements) of this Decree, as

provided in a written agreement between the Defendant and the proposed transferee, enforceable

by the United States as a third-party beneficiary of such agreement.  At least thirty (30) Days

prior to such transfer, Defendant shall provide a copy of this Consent Decree to the proposed

transferee and shall simultaneously provide written notice of the prospective transfer, together

with a copy of the proposed written agreement, to EPA Region 7 and to the United States

Department of Justice, in accordance with Section XIV of this Decree (Notices).  Any transfer of

ownership or operation of the Pipeline without complying with this Paragraph constitutes a

violation of this Decree.

      3.     Defendant shall provide a copy of this Consent Decree to all officers, employees,

and agents whose duties might reasonably include compliance with any provision of this

Decree.  Defendant shall also provide to any contractor retained to perform work required under

this Consent Decree with a copy of the provisions of the Consent Decree that are relevant to the

work that contractor is performing.  Defendant shall condition any contract to perform such work

upon performance of the work in conformity with the terms of this Consent Decree.

      4.     In any action to enforce this Consent Decree, Defendant shall not raise as a

defense the failure by any of its officers, directors, employees, agents, or contractors to take any

actions necessary to comply with the provisions of this Consent Decree.

### III. **DEFINITIONS**

1.     Terms used in this Consent Decree that are defined or used in the CWA, or in regulations promulgated thereunder, shall have the meanings assigned to them in such statute or such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.     "Calendar Year" or "Year" shall mean the period of time consisting of 365 or 366 days beginning on January 1 and continuing to and including December 31.

b.     "Complaint" shall mean the complaint filed by Plaintiff in this action, unless noted otherwise.

c.     "Consent Decree" or "Decree" shall mean this Decree.

d.     "Day" shall mean a calendar day unless expressly stated to be a working day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day.

e.     "Deep Tilling" shall mean agricultural activity, including plowing and ripping, where the earth is disturbed greater than 18 inches in depth or greater than the known pipeline depth.

f.     "Defendant" shall mean Magellan Pipeline Company, L.P.

g.     "Listed Discharges" shall mean the discharges of oil from the Pipeline into the environment which are listed on Attachment A to this Consent Decree.

h.     "Effective Date" shall mean the day that this Consent Decree is entered and signed by the Court.

i.     "Excavation" shall mean the movement of earth, rock, soil, or other material by any means including blasting, boring, channeling, grading, clearing, tunneling,

4

drilling, jack-hammering, digging, or backfilling below the existing grade by non-mechanical or mechanical equipment or by explosives.  Excavation shall not include normal agricultural practices, including plowing, tilling, planting, and harvesting that are unlikely to reach the depths of the Pipeline.

   j.  "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

   k.  "High Consequence Area" shall mean areas as defined by 49 C.F.R § 195.450.

   l.  "High Impact and Risk Area" or "HIRA" shall mean each geographic area in which the Pipeline is located that satisfies all of the following three criteria:

   (1)  an area that has been designated as a High Consequence Area ("HCA") or, if not an HCA, an area that is listed on Attachment B which reflects additional areas in which there is a reasonable expectation that a Pipeline discharge could affect a water feature appearing on United States Geological Survey topographical maps 1:24,000 scale; and

   (2)  an area where Defendant's existing information indicates that the Pipeline is buried at a depth less than thirty (30) inches; and

   (3)  an area where machinery is used to plant, weed, harvest or otherwise facilitate crop growth.

   m.  "One Call" shall mean any system used by a state through which contractors and other excavators may alert the State and utilities to a planned Excavation and determine whether the planned Excavation is in an area where there is a pipeline, electric, gas or other buried conduit or utility.

5

n.      "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral.

o.      "Parties" shall mean the United States and Magellan.

p.      "Pipeline" shall mean the assets used to transport oil or petroleum products, including all of its components and terminals as depicted on Attachment C., owned and operated by Magellan as of the Date of Lodging of this Consent Decree that are located in the states of Oklahoma, Arkansas, Kansas, Missouri, Illinois, Nebraska, Iowa, South Dakota, North Dakota, Minnesota, and Wisconsin.  The "Pipeline" shall not include the Menard to Heyworth segment, as depicted on Attachment D, if a potential buyer of this segment exercises its option to purchase this segment prior to the termination of this Consent Decree.  The Pipeline also shall not include the Menard Terminal, which is located at an endpoint of the Menard to Heyworth segment and is not part of the purchase option for this segment, if it is sold prior to the termination of this Consent Decree.

q.      "PHMSA" shall mean the Pipeline and Hazardous Materials Safety Administration, currently part of the United States Department of Transportation.

r.      "Plaintiff" shall mean the United States.

s.      "Pipeline Right of Way" or "ROW" shall mean the strip of land or water upon which the Pipeline is located and on which the Defendant has a legal right to bury, maintain and access the Pipeline.

t.      "Section" shall mean a portion of this Decree identified by a Roman numeral.

u.      "Termination Date" shall mean the date on which Defendant's obligations under this Consent Decree terminate as provided by Section XVIII of this Consent Decree.

6

      v.    "United States" shall mean the United States of America, acting on behalf of EPA.

IV.**PAYMENT OF CIVIL PENALTY**

1.    Within thirty (30) Days after the Effective Date of this Consent Decree, Defendant shall pay a civil penalty under Section 311(b) and (j) for the listed discharges and SPCC violations in the amount of $5,300,000 to the United States as follows:

    a.    Within fifteen (15) business days after the Defendant has received notice that this Consent Decree has been lodged, the Defendant shall pay into an escrow account bearing interest on commercially reasonable terms, in a federally-chartered bank (the "United States Escrow Account"). Such monies shall remain in escrow until entry of this Decree. If this Decree is not entered by the Court, and the time for any appeal of that decision has run, or if the Court's denial of entry is upheld on appeal, the monies placed in escrow, together with accrued interest thereon, shall be returned to the Defendant. If this Decree is entered by the Court, Defendant shall, within fifteen (15) Days thereof, cause the monies (including all accrued interest) in the United States Escrow Account to be released and disbursed to the United States.

2.    Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with instructions to be provided to Defendant, following lodging of this Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the District of Kansas. The payment shall reference the Civil Action Number assigned to this case and DOJ Number 90-5-1-1-06074/1, and USAO No. 2008V00281, and shall specify that the payment is made toward CWA civil penalties to be deposited into the Oil Spill Liability Trust Fund pursuant to 33 U.S.C. § 1321(s), § 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8). Any funds received after 4:00 p.m. Eastern Time shall be credited on the next business day. At the time of payment, Defendant shall simultaneously send written notice of

payment and a copy of any transmittal documentation to Plaintiff in accordance with Section

XIV of this Decree (Notices) and to:

> Commander Robert W. Bruce
> United States Coast Guard
> Office of Claims and Litigation
> 2100 Second Street, S.W.
> Washington, D.C. 20593-0001

3.       Defendant shall not deduct the civil penalties paid under this Section in

calculating its federal income tax.

## V. **LEAK AND RUPTURE DETECTION**

1.       <u>Verification of In Line Inspection Results</u>.  Defendant shall adhere to the

following requirements pertaining to its generation of calibration or unity curves for its inline

inspection ("ILI") tools.

a.       Within three (3) months following completion of the anomaly

investigations associated with each ILI intended to inspect Electric Resistance Welded ("ERW")

longitudinal seam integrity, both the weld and weld heat affected zone ("HAZ") (i.e., in-line

inspections using circumferential magnetic flux tool or shear wave ultrasonic ILI tools),

Defendant shall perform verification of ILI identified anomalies to confirm performance of the

inspection tool.  Verification shall consist of performing a statistically valid comparison analysis

between ILI predicted anomalies and measured anomalies.  Physical measurements of the ILI

reported anomaly during subsequent field investigations, or previously documented physical

measurements of the anomaly from prior examinations of the pipeline shall be utilized.  The

comparisons shall be used to develop two sets of unity plots - length of axial oriented anomaly

and depth into pipe wall.  ILI anomalies include detectible seam weld and HAZ features and

indications as described in the ILI vendor's written performance specification.  For ILIs where

an insufficient number of seam and HAZ anomalies are identified to perform a statistically valid

8

comparison analysis, anomaly comparisons may include other ILI indications.  In these instances Defendant shall document the actual versus predicted indication characteristics for each ILI run on a particular pipeline segment.

        b.      Within three (3) months following completion of the anomaly investigations associated with each ILI intended to determine general corrosion (e.g. ultrasonic, magnetic flux) or ovality/dent (e.g. geometry tools), Defendant shall perform verification of ILI identified anomalies to confirm performance of the inspection tool.  Verification shall consist of performing a statistically valid comparison analysis between ILI predicted anomalies and measured anomalies.  Physical measurements of the ILI reported anomaly during subsequent field investigations, or previously documented physical measurements of the anomaly from prior examinations of the pipeline shall be utilized.  The comparisons shall be used to develop a unity plot for each ILI run on a particular pipeline segment.  For ILIs where an insufficient number of corrosion or ovality/dent anomalies are identified to perform a statistically valid comparison analysis, anomaly comparisons may include other ILI indications.  In these instances Defendant shall document the actual versus predicted indication characteristics for each ILI run on a particular pipeline segment.  ILI anomalies include detectible metal loss and geometry features and indications as described in the ILI vendor's written performance specification.  For ILIs where no anomalies are identified, anomaly comparisons may include other ILI indications.  In these instances Defendant shall document the actual versus predicted indication characteristics for each ILI run on a particular pipeline segment.

        c.      Within six (6) months of the Effective Date, Defendant shall comply with all requirements in the API 1163 "In-line Inspection Qualification Standard" (issued by the American Petroleum Institute in August of 2005).

9

d.      Defendant shall retain all documents and records pertaining to its generation of unity curves for four (4) years and make them available to EPA or PHMSA upon request.

2.      Pilot Computerized Leak Detection System

a.      Within six months of the Effective Date, Defendant shall construct or acquire and implement a pilot computerized leak detection system on the El Dorado to KC Terminal pipeline segment, as depicted on Attachment E.

b.      This leak detection system shall comply with the latest edition of API 1130 incorporated into 49 CFR Part 195 (as of the Effective Date) and shall gather data from the field through the Supervisory Control and Data Acquisition ("SCADA") system and equipment and generate the following plots for the pipeline segment or segments designated and approved pursuant to Paragraph a. above:  (1) The volumetric measurement Daily Loss/Gain Balance spanning the pipeline segment over specified time periods (including loss/gain expected limits), and (2) Accumulated Loss/Gain trends to assist in the detection of low rate leaks over an extended time period.  Defendant shall create separate leak alarm parameters (separate alarms from those utilized in the SCADA system prior to May, 2005) for this system based on the accumulated loss/gain data using the required field instrumentation.  These separate leak detection system alarms shall not be modified by controllers except as may be required to test and properly set up the alarm feature for the leak detection system.

c.      After full implementation and start up, Defendant shall operate this pilot system for at least two (2) years.  After two (2) years, within the Annual Report required by Section VIII (Annual Reporting Requirements), Defendant shall provide a written evaluation of the system to EPA with a copy to PHMSA that assesses how the pilot system performed and

10

state whether it would be beneficial to implement system-wide.  Regardless of Defendant's

evaluation, this Consent Decree does not require Defendant to operate this system for more than

two (2) years or to implement it system-wide.

        d.      Defendant shall retain all documents and records pertaining to the pilot

leak detection system described in sections a. through d. of this Paragraph for four (4) years and

make them available to EPA or PHMSA upon request.

        3.      SCADA Operator Training and Evaluation

        a.      Within six (6) months after the Effective Date, Defendant shall purchase,

implement, and use a "full pipeline simulator hydraulic model software package" (as utilized in

this Paragraph, the term "full pipeline simulator hydraulic model software package" shall mean a

simulator that is capable of closely approximating the look, feel, interactive hydraulic reaction

and operation of the associated console) that simulates pipeline ruptures, leaks of the magnitude

capable of being detected by the SCADA system and modeled by the hydraulic software

package, and transient conditions.  This software package shall be similar in form and function

to the Advantica's Stoner Pipeline Simulator, Energy Solutions, or Televent's SimSuite Pipeline

products.

        b.      Defendant shall demonstrate to EPA and PHMSA proficiency with this

simulator on a mutually convenient date to be determined by Defendant and EPA not more than

eighteen (18) months after the Effective Date.

        c.      Within six (6) months of demonstrating full pipeline simulator hydraulic

model software package proficiency, all of Defendant's SCADA controllers (Controllers) shall

be trained and qualified on the purchased software package simulation and then re-trained and

qualified at intervals not to exceed eighteen (18) months (unless required at shorter intervals by

11

other operator program documentation) on purchased or developed simulation modules.  Further, newly hired Controllers shall be trained using the purchased software package before they are allowed to operate any part of the pipeline system without direct supervision.  Leak or rupture conditions experienced within the Pipeline in the five (5) year period before the Lodging of this Decree, for which adequate data is available and that are capable of being detected by the SCADA system and modeled by the hydraulic software package, and any similar leak or rupture scenarios occurring in the future that are not represented by previously developed scenarios, shall be modeled through this system and interactive training developed for the Controllers based on the leaks and ruptures from the prior five (5) years or future events occurring during this Consent Decree term.  Controllers shall demonstrate proficiency with simulations and the associated leak or rupture events, recognition of the developing signs of these conditions and the training modules developed as a result of leak or rupture conditions.  When possible, training of Controllers shall also be done with the purchased software system for controller recognition and response to "near miss" conditions and abnormal operating conditions, using simulations based on previous real events and/or modules designed to enhance the Controllers' recognition and reaction to abnormal operating condition development or likely system events requiring Controller response or interaction.  Defendant shall document each Controller's proficiency and training on each module of the purchased or developed software and shall maintain such documentation for four (4) years and make it available to EPA or PHMSA upon request.

 Defendant shall review each Controller's performance at intervals not exceeding eighteen (18) months (unless required at shorter intervals by other operator program documentation), maintain documentation regarding this review, and provide remedial or additional training as necessary to address any deficiencies identified in its periodic reviews.

12

4.      <u>Instrumentation Maintenance Priority</u>.  Within sixty (60) Days of the Effective Date, Defendant shall revise its procedures and System Integrity Plan (SIP) to assign a high repair priority to instrumentation indicators that assist Controllers with leak or rupture detection (such as pressure indicators, pressure/flow/temperature transmitters and gauges) or provide abnormal operating conditions detection.

5.      <u>Leak Response Operating Procedures</u>.  Within sixty (60) Days of the Effective Date, Defendant shall submit to EPA and PHMSA, for review and approval by EPA (pursuant to Section VII below), proposed modifications to its operating procedures that will require Defendant's SCADA Controllers to initiate the safe shutdown of pumps and the closure of appropriate remote operated valves in the event that a product release is detected or confirmed. Defendant shall also develop written procedures to initiate an investigation to determine whether a suspected leak or release is an actual leak or release as soon as possible (no longer than within two (2) hours) after receipt of information that a leak or release may be occurring.  Defendant shall retain documents related to the development of this procedure or procedures and suspected leak or release response times for four (4) years.  Controllers and other appropriate personnel shall be trained on these shutdown and investigative procedures.  Defendant shall also prepare separate shutdown procedures to address suspected leak conditions.  A training program for Controllers shall be developed by the Defendant specific to these suspected leak response shutdown procedures and this training program shall place an emphasis on the Controllers authority to shutdown the pipeline when a product release is detected or suspected (regardless of whether a leak or release has been confirmed).  Both the EPA and the Defendant recognize that nuisance shutdowns can introduce further safety concerns and that is not the objective of this Paragraph.  Defendant may propose to exempt certain pipeline segments from the leak response

13

release requirement if Defendant can demonstrate that this procedure is not advisable because of a particular pipeline segment's geographical, elevation, mechanical, or other features.  EPA, in consultation with PHMSA, will review and approve Defendant's proposed amended procedures pursuant to Section VII below.

VI.<u>EXTERNAL FORCE AND RIGHT OF WAY MANAGEMENT</u>

1.      <u>Potential Conflict with DOT Part 195.440, Public Awareness</u>. With respect to matters addressed in Paragraphs 17-29 below, if there is any conflict with DOT Part 195.440 or required compliance with API 1162 or other applicable law or regulations, Defendant shall comply with the stricter requirement.

2.      <u>Aerial Patrol Activities</u>. Within six (6) months of the Effective Date, a Defendant employee will fly with each pilot doing aerial patrols on behalf of Defendant at least once every Calendar Year.  The Defendant employee shall be trained and qualified in recording and reviewing ROW concerns during the aerial patrol, including but not limited to, encroachments, potential for mechanical damage, exposed pipe and farming methods.  Defendant shall document its compliance with this Paragraph and retain copies of all documents and communications related to its compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

3.      <u>Defendant's Contractor Requirements</u>.  Within six (6) months of the Effective Date, Defendant shall require that all of its contractors performing Excavation activities use the One Call system applicable in the State in which they are working and adhere to Excavation best practices of the Common Ground Alliance Best Practices 4.0, available at www.commongroundalliance.com.  Defendant shall retain copies of all documents and communications related to its compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

14

4.      <u>Notification to State of Excavators Not Following One Call</u>.  Beginning on the Effective Date of this Consent Decree, whenever Defendant becomes aware of any contractors, excavators, ROW owners, or tenants who have performed an Excavation that potentially impacts the Pipeline requiring One Call notification in accordance with applicable state law without notifying an applicable One Call system, Defendant shall notify the state authorities responsible for enforcement.  Defendant shall also contact such contractors, excavators, ROW owners or tenants as soon as it becomes aware of such incident and inform them of the One Call system and its importance in preserving pipeline integrity.  Defendant shall retain copies of all documents and communications related to its compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

5.      <u>Designation of High Impact and Risk Areas ("HIRAs")</u>.  The Parties agree that the segments listed on Attachment F are designated HIRAs consistent with the definition of HIRA set forth in Paragraph 7(l).  Defendant shall review all available data once per Calendar Year and propose to EPA, for EPA review and approval (pursuant to Section VII below), any necessary amendments to the designated HIRAs that are consistent with the definition of HIRA in Paragraph 7(l), above.  This Consent Decree does not require Defendant to conduct additional line depth surveys or verify or validate Pipeline burial depth data beyond information that Defendant has as of the Effective Date of this Consent Decree but does not excuse Defendant from complying with applicable law or regulations with respect to line depth surveys or information.

6.      <u>Appointment of a HIRA Coordinator</u>.  Within sixty (60) Days after the Effective Date, Defendant shall appoint one person to be its HIRA Coordinator.

7.      Additional Measures in HIRAs.

15

a.      <u>Ground Monitoring</u>.  Within four (4) months after the Effective Date of this Consent Decree, and once every Calendar Year thereafter, Defendant shall conduct ground monitoring of all Pipeline segments located in designated and approved HIRAs by walking or driving along the Pipeline.  During this and any other monitoring, the monitors shall note in writing any observation of special threats to the pipeline including but not limited to abnormal loading, Deep Tilling within 75 feet of the Pipeline, Excavation within 75 feet of the Pipeline, surface grading within 75 feet of the Pipeline, inadequate markers, and/or any exposed pipe. These threats shall be promptly reported to the Defendant's HIRA Coordinator.  The monitors shall also immediately determine if any observed Deep Tilling or Excavation activities within 75 feet of the Pipeline were reported to the applicable state's One Call system.  If the monitors determine that the observed Deep Tilling or Excavation was not reported to the state's One Call system, the monitor shall notify the appropriate Magellan personnel who would normally have received a One Call notification who shall treat the Deep Tilling or Excavation as if it had been the subject of a One Call notification.  Defendant shall retain copies of all documents and communications related to its compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

b.      <u>ROW Owner Education</u>.  Within four (4) months of the Effective Date of this Consent Decree, and then once every Calendar Year thereafter, where a distinct ROW exists, Defendant shall use reasonable efforts to notify in writing those persons who own or lease property along the Pipeline ROW in a designated and approved HIRA of the presence of the Pipeline, the ROW general location, the fact that the pipeline may be located anywhere within the ROW, how to recognize a leak, what action to take in the event of a leak, who to call in the event of a leak, and that shallow coverage of the pipeline exists.  The Defendant shall make

16

similar notifications when the Pipeline is covered under a blanket easement to those persons who control the land over the Pipeline.  Such written notification shall include a statement that the tenant/landowner is responsible for communicating the presence of a shallow buried pipeline to individuals performing work for the tenant or landowner on or near the pipeline or the distinct ROW, and for notifying the applicable One-Call system before performing certain activities near the pipeline or distinct ROW.  The One Call notification language for these notices to landowners/tenants shall be tailored to each applicable state's specific One Call program.  This notification may be provided at the same time and in the same correspondence as the yearly surveys to land owners/tenants in subparagraph c. below and special notification where Deep Tilling is known to have occurred as set forth in subparagraph d. below.  Defendant shall retain copies of all documents and communications related to its compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

       c.     <u>Yearly Surveys to ROW Land Owners and Tenants</u>.  Within four (4) months of the Effective Date of this Consent Decree, and once every Calendar Year thereafter, Defendant shall use reasonable efforts to distribute to every person who owns or leases land along the Pipeline ROW in a designated and approved HIRA, a survey that requests specific information on how their land is being used, is likely to be used in the future, and specifically asking about farming methods, routine Excavation, planned special Excavations, building and/or development activities and any other potential threats to the pipeline.  These surveys shall be delivered by ground monitors in person when possible and otherwise by mail (with return postage provided) and may be delivered in conjunction with subparagraphs (b) above and (d) below.  The information gathered in response to these surveys shall be provided to the HIRA Coordinator. Defendant shall retain copies of all documents and communications related to its

17

compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

        d.     <u>Special Notification to ROW Owners/Tenants in HIRAs Where Deep Tilling has Been Observed</u>.  At least twice a Calendar Year after the Effective Date of this Consent Decree, Defendant shall use reasonable efforts to notify ROW land owners and tenants along HIRA Pipeline segments where Deep Tilling has been observed by Defendant's monitors or otherwise reported to Defendant, of the specific threat posed to the Pipeline by Deep Tilling and offer to provide increased ground marking of the related pipeline segment.  Defendant shall retain copies of all documents and communications related to its compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

        e.     <u>Notification to HIRA Excavators, Contractors and Land Developers</u>. Within four (4) months after the Effective Date of this Consent Decree, Defendant shall use reasonable efforts to identify all contractors, excavators and land developers operating in each designated and approved HIRA.  Within six (6) months after the Effective Date of this Consent Decree, and once each Calendar Year thereafter, Defendant shall use reasonable efforts to notify all such contractors, excavators, and developers in writing of the Pipeline locations in their area, that the Pipeline includes segments buried at shallow depths, and provide them with information about any applicable One Call system.  Defendant shall maintain this list of contractors, excavators and land developers and use reasonable efforts to update it annually.  Defendant shall retain copies of all documents and communications related to its compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

        8.     <u>Use of HIRA Threat Information</u>.  Within six (6) months of the Effective Date of this Consent Decree, Defendant shall create a centralized computerized system to track the

external force threats to pipeline segments in designated and approved HIRAs (HIRA External Threat System). SCADA Controllers shall have access to this centralized data system in the SCADA control centers. Any information concerning activities that pose threats to the Pipeline that Defendant acquires from its monitoring, land owner surveys, land owners and contractor education activities, or other sources (including notice of Excavations where One Call was not notified) shall be reported to the HIRA Coordinator, who shall ensure the entry of this information into the HIRA External Threat System. The HIRA Coordinator shall compile, review, analyze and disseminate this information in an appropriate written format to appropriate personnel of Defendant, including the SCADA Controllers, on a quarterly basis.

9.      Magellan Presence at HIRA Excavations Occurring within Five Feet of the Pipeline. Defendant shall have personnel on location for the duration of all third party Excavation activities within five (5) feet of the Pipeline located in a designated and approved HIRA. This obligation shall be triggered whenever Defendant receives information of such an Excavation through a One Call system, or by any other manner (e.g. aerial patrol, ROW inspection). Defendant shall retain copies of all documents and communications related to its compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

10.     Evaluation of HIRA Measures. Defendant shall provide to EPA and PHMSA a written evaluation of the effectiveness of the above HIRA requirements set forth in Paragraphs 20-25 above within each Annual Report required by Section VIII below.

11.     If any information gathered pursuant to this Consent Decree or by other means demonstrates that Excavation or Deep Tilling is regularly occurring at depths or in a manner that may cause damage to a buried pipeline, Defendant shall either reach agreement with the

19

landowner to cease such activities, or lower this segment of the Pipeline.  Defendant shall retain copies of all documents and communications related to its compliance with this Paragraph for at least four (4) years and make them available to EPA or PHMSA upon request.

12.     Defendant's Participation in Common Ground Alliance Partnerships.  Beginning upon the Effective Date of this Consent Decree and until the Termination Date, Defendant shall serve as a "sponsor" of Common Ground Alliance (CGA) and shall specifically be a listed member and regularly attend meetings of the Kansas City, Kansas Regional CGA.

13.     Funds for Mitigation of External Pipeline Threats.  During the four (4) year period after the Effective Date of this Consent Decree, Defendant shall spend at least $750,000 in total on the following activities to mitigate external threats to the pipeline: (1) relocating, recovering, lowering or replacing Pipeline segments located in designated and approved HIRAs; and/or (2) the installation of remote shutoff valves on Pipeline segments that would minimize release volumes in a designated and approved HIRA, and/or (3) the installation of physical barriers that protect the Pipeline, such as fences or pipeline protective covers such as concrete barriers, and/or (4) any other acceptable mitigation efforts that have been pre-approved by EPA pursuant to Section VII below.  Within the first three (3) Annual Reports required by Section VIII below, Defendant shall submit documentation of expenditures within the reporting period that are consistent with these stated purposes, for EPA approval pursuant to Section VII below.  EPA may disapprove any expenditures claimed by Defendant in satisfaction of this Paragraph on the sole ground it does not satisfy one of the four categories described above, subject to Defendant's right to Dispute Resolution (Section XI).  Should EPA take this action and the Defendant not be successful in Dispute Resolution (Section XI), this amount shall not be deducted from the total expenditures required by Defendant pursuant to this Paragraph, and the

20

obligations for mitigation expenditures shall continue until EPA has approved $750,000 in

expenditures.  This Paragraph does not limit Defendant's obligation, if any, to undertake any of

the above measures to the extent required by applicable law.

14.     Within thirty (30) days of the Effective Date, Defendant will make any changes to

its SPCC Plans for its facilities in Roca, Nebraska and Coralville, Iowa that are necessary to

ensure that such plans are in compliance with Section 311(j) of the CWA and implementing

regulations.

### VII. **EPA APPROVAL OF DELIVERABLES OR COMPLIANCE METHODS**

1.      <u>Approval of Deliverables</u>:  After review of any plan, report, designation,

expenditures or method of compliance that Defendant is required to submit to EPA for approval

pursuant to this Consent Decree, EPA shall in writing: a) approve the submission; b) approve the

submission upon specified conditions; c) approve part of the submission and disapprove the

remainder with a written explanation of the grounds for disapproval or d) disapprove the

submission with a written explanation of the grounds for disapproval.

2.      If the submission is approved pursuant to Paragraph 30, Defendant shall take all

actions required by the plan, report, or other document, in accordance with the schedules and

requirements of the plan, report, or other document, as approved.  If the submission is

conditionally approved or approved only in part, pursuant to Paragraph 30, Defendant shall,

upon written direction from EPA, take all actions required by the approved plan, report, or other

item that EPA determines are technically severable from any disapproved portions, subject to

Defendant's right to dispute only the specified conditions or the disapproved portions, under

Section XI of this Decree (Dispute Resolution).

3.      If the submission is disapproved in whole or in part pursuant to Paragraph 30,

Defendant shall, within forty-five (45) Days or such other time as the Parties agree to in writing,

21

correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the re-submission is approved in whole or in part, Defendant shall proceed in accordance with the preceding Paragraph.

4.      Any stipulated penalties applicable to the original submission, as provided in Section IX of this Decree, shall not accrue unless (1) Defendant failed to provide any submission by the due date; (2) the original submission, if provided, was so deficient as to constitute a material breach of Defendant's obligations under this Decree; or (3) any re-submission is untimely or is disapproved in whole or in part because it is so deficient as to constitute a material breach of Defendant's obligations under this Decree.  Stipulated penalties applicable to the original submission shall be due and payable subject to Paragraphs 38 - 40 even if a subsequent re-submission is ultimately approved by EPA.

5.      If a submitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs.

VIII.<strong><u>ANNUAL REPORTING REQUIREMENTS</u></strong>

1.      In addition to any submittals or record keeping required above, within three (3) months following the first annual anniversary of the Effective Date, Defendant shall submit an Annual Report fully documenting the performance of Defendant of the tasks required by Sections V, VI and VII above including any specific submissions required by those Paragraphs. Thereafter, during the pendency of this Decree, by the annual anniversary of this date, Defendant shall submit an updated Annual Report documenting the performance of Defendant of the tasks required by Sections V, VI and VII above.  These Annual Reports shall be submitted as specified in Section XIV (Notices).  Within the fourth and final Annual Report, Defendant shall

22

provide an evaluation of the Defendant's experience in the implementation of the injunctive relief requirements set forth in Sections V, VI and VII.  This evaluation is to be provided subsequent to Magellan having fulfilled all of its obligations under this Consent Decree and shall include (1) a description of what elements of the required injunctive relief Defendant anticipates continuing after termination of this Consent Decree; and (2) what elements of the required injunctive relief Defendant anticipates continuing in a modified form.  In no event shall this evaluation be a basis, in any manner whatsoever, for stipulated penalties or any other violation under this Consent Decree.

2.      Each report submitted by Defendant under this Section shall be signed by a responsible corporate officer of the submitting party and include the following certification:

> I certify under penalty of law that this document and its attachments were prepared either by me personally or under my direction or supervision in a manner designed to ensure that qualified and knowledgeable personnel properly gather and present the information contained therein.  I further certify, based on my personal knowledge, or to the best of my knowledge based on my inquiry of those individuals immediately responsible for obtaining the information, that the information is true, accurate and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowingly and willfully submitting a materially false statement.

## IX. STIPULATED PENALTIES

1.      If Defendant fails to make the payments required under Section IV when due, Defendant shall pay a stipulated penalty of ten thousand dollars ($10,000) to Plaintiff per day for each day that the payment is late.  Late payment of the civil penalty shall be made in accordance with payment instructions in Section IV above.  Stipulated penalties shall be paid in accordance with the instructions set forth in Paragraph 41 below.

23

2.      Defendant shall be liable for stipulated penalties in the amounts detailed below to the United States for all other violations of this Consent Decree, unless excused under Section X (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, including any obligations under Sections V, VI, VII or VIII, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.  The amount of the stipulated penalties are:

| Penalty Per Violation Per Day: | Period of Noncompliance: |
|---|---|
| $500 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $4,000 | 31st day and beyond |

3.      Stipulated penalties under this Section shall begin to accrue on the day after performance is due, and shall continue to accrue until performance is satisfactorily completed or the violation otherwise cured.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.  Defendant shall pay any stipulated penalty within thirty (30) Days of receiving a written demand.  The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due under this Consent Decree.

4.      Stipulated penalties shall continue to accrue as provided in Paragraph 39, above, during any Dispute Resolution, with interest on accrued penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

a.      If the dispute is resolved by agreement, Defendant shall pay accrued stipulated penalties determined to be owing, together with interest, to Plaintiff within thirty (30) Days of the Effective Date of that agreement unless that agreement limits or waives such penalties;

b.      If the dispute is submitted to the Court and Plaintiff prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c. below;

c.      If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate Court decision.

5.      Defendant shall, as directed by the United States in its demand, pay stipulated penalties owing to the United States by EFT or by certified or cashier's check in the amount due, payable to the U.S. Department of Justice, referencing the civil action number assigned to this case and DOJ Number 90-5-1-1-06074/1, and delivered to the office of the United States Attorney, District of Kansas, to be deposited in the U.S. Treasury.  The payment documents shall specify that the payments are for stipulated penalties to be deposited into the United States Treasury pursuant to 31 U.S.C. § 3302.

6.      Defendant shall not deduct stipulated penalties paid under this Section in calculating federal income tax.

7.      If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28

U.S.C. § 1961, accruing as of the date payment of stipulated penalties became due under

Paragraph 39.

8.      Subject to the provisions of Section XII of this Consent Decree (Effect of

Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree

shall be in addition to any other rights, remedies, or sanctions available to Plaintiff for

Defendant's violation of this Consent Decree or applicable law.

## X.**FORCE MAJEURE**

1.      "Force Majeure," for purposes of this Consent Decree, is defined as any event

arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or

of Defendant's contractors, that delays or prevents the performance of any obligation under this

Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that

Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate

any potential Force Majeure event and best efforts to address the effects of any such event (a) as

it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the

greatest extent possible.  "Force Majeure" does not include Defendant's financial inability to

perform any obligation under this Consent Decree.

2.      If any event occurs or has occurred that may delay the performance of any

obligation under this Consent Decree, whether or not caused by a force majeure event,

Defendant shall provide notice orally or by electronic or facsimile transmission to EPA within

72 hours of when Defendant first knew that the event might cause a delay.  Within seven (7)

Days thereafter, Defendant shall provide in writing to EPA an explanation and description of the

reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to

prevent or minimize the delay; a schedule for implementation of any measures to be taken to

prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such

26

delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a Force Majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

3.      If EPA agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

4.      If EPA does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, EPA will notify Defendant in writing of its decision.  If EPA does not notify the Defendant of its decision within thirty (30) Days after the Defendant's notice of a Force Majeure event is received, stipulated penalties associated with violations of this Consent Decree related to the asserted Force Majeure event shall not accrue between the 30th Day after Defendant's notice was received by EPA and the day that EPA notifies Defendant of

its decision.  Defendant can seek dispute resolution pursuant to Section XI for EPA's failure to give timely notification.

     5.     If Defendant elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of EPA's notice.  In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 45 - 48 above.  If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

XI.**DISPUTE RESOLUTION**

     1.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism for Defendant to resolve disputes arising under or with respect to this Consent Decree.  Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

     2.     <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal

negotiations, then the position advanced by the United States shall be considered binding unless, within thirty (30) Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

       3.     <u>Formal Dispute Resolution</u>. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

       4.     The United States shall serve its Statement of Position within forty-five (45) Days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

       5.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIV of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

6.      The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

7.      In any dispute brought before the Court under Paragraphs 54-55 above, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree and the CWA, and that Defendant is entitled to relief under applicable law.

8.      The invocation of dispute resolution procedures under this Section shall not extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, not directly in dispute. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 40, above.  If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII. **EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS**

1.      The United States hereby covenants not to sue and agrees not to assert any claims against Defendant under Section 309(b) and (d) and Section 31l(b)(7)(A) and (j) of the CWA, 33 U.S.C. §§ 1319(b)(d), 1321 (b)(7)(A) and (j) for injunctive relief or civil penalties arising from the Listed Discharges or for Defendant's failure during the period prior to the lodging of this Consent Decree to implement SPCC Plans at the Defendant's terminals located in Roca, Nebraska and Coralville, Iowa.

2.      Notwithstanding Paragraph 58 above, the United States reserves, and this Consent Decree is without prejudice to, its right to institute a claim against Defendant with respect to all matters other than those expressly specified in Paragraph 58 including, but not limited to, the following:

30

a.      claims based on a failure of Defendant to meet a requirement of this Consent Decree;

b.      claims for criminal liability;

c.      claims relating to past, present, or future discharges of oil other than the Listed Discharges;

d.      claims for reimbursement for any disbursements from the federal Oil Spill Liability Trust Fund arising from the Listed Discharges, other discharges or threats of discharge, pursuant to the Oil Pollution Act of 1990 ("OPA"), Section 311(f) of the CWA, including for subrogated claims under Section 1015 of OPA, 33 U.S.C. § 2715;

e.      claims under the Pipeline Safety Act ("PSA"), 49 U.S.C. § 60101 et. seq. including claims related to the Listed Discharges.

f.      claims for natural resources damages (under the CWA, OPA, CERCLA or other legal authority) arising from any of the Listed Discharges or other discharges; and

g.      claims for injunctive relief or reimbursement of removal or remediation costs under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606, 9607, with respect to the Listed Discharges.

3.      Plaintiff reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to prevent or limit the rights of the United States to obtain penalties or injunctive relief under any federal or state laws, regulations, or permit conditions, except as expressly specified herein.

4.      In any subsequent administrative or judicial proceeding reserved herein and initiated by the United States for unreimbursed costs, damages, remediation, or other appropriate relief relating to Defendant's violations, Defendant shall not assert, and may not maintain, any

31

defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case.  Except as provided herein, Defendant reserves its defenses to any such action.

5.      This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to said laws, regulations, or permits.  Plaintiff does not, by its consent to the entry of this Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, or with any other provisions of federal, state, or local laws, regulations, or permits.

6.      This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

7.      This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

8.      Defendant hereby covenants not to sue and agrees not to assert any claims related to the Listed Discharges, or response activities or natural resource damages in connection with the Listed Discharges, against the United States pursuant to the CWA, OPA, or any other federal law, state law, or regulation including, but not limited to, any direct or indirect claim for reimbursement from the Oil Spill Liability Trust Fund, as defined in Section 1001 of OPA,

32

33 U.S.C. § 2701(11) and any direct or indirect claim for reimbursement from the Hazardous

Substance Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. §9507)

through CERCLA Sections §§106(b)(2), 107, 111, 112, 113 or any other provision of law.

## XIII. **COSTS**

1.      The Parties shall bear their own costs of this action, including attorneys' fees.

## XIV. **NOTICES**

1.      Unless otherwise specified herein, whenever notifications, submissions, reports or

communications are required by this Consent Decree, they shall be made in writing and

addressed to all parties as follows:

As to the United States:

As to the U.S. Department of Justice:

> Chief (re: DJ # 90-5-1-1-06074/1)
> Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, DC  20044-7611

As to EPA Region 7:

> Ward A. Burnss, P.E.
> Storage Tank & Oil Pollution Branch
> EPA Region 7
> 901 N. 5th Street
> Kansas City, Kansas  66101

To provide verbal notification as required by this Decree: 913/551-7879

As to PHSMA:

> Ivan Huntoon
> Pipeline and Hazardous Materials Safety Administration
> 901 Locust Street, Suite 462
> Kansas City, Missouri  64106-2641

As to Defendant:

33

Paul E. Pratt
Associate General Counsel
Magellan Pipeline Company, L.P.
One Williams Center, Suite 2800
Tulsa, Oklahoma  74121-2186

Kevin A. Gaynor
Vinson & Elkins LLP
Suite 600
1455 Pennsylvania Avenue, NW
Washington, DC  20044

2.      Any Party may, by written notice to the other Parties, change its designated notice

recipient or notice address provided above.

3.      Notices submitted pursuant to this Section shall be deemed submitted upon

mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties

in writing.

## XV. **EFFECTIVE DATE**

1.      The Effective Date of this Consent Decree shall be the date upon which this

Consent Decree is entered by the Court.

## XVI. **RETENTION OF JURISDICTION**

1.      The Court shall retain jurisdiction over this case until termination of this Consent

Decree, for the purpose of resolving disputes arising under this Decree or entering orders

modifying this Decree, pursuant to Sections XI (Dispute Resolution) and XVII (Modification),

or effectuating or enforcing compliance with the terms of this Decree.

## XVII. **MODIFICATION**

1.      The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to any term of this Decree, it shall be effective only upon approval by the Court.

## XVIII. **TERMINATION**

1.      Defendant shall comply with all of the obligations under this Consent Decree for at least four (4) years from the Effective Date.  The obligations of Defendant under this Consent Decree shall terminate four (4) years after the Effective Date or after Defendant has satisfactorily complied with the requirements of this Consent Decree, whichever is later.  Defendant shall give notice to EPA and PHMSA at least ninety (90) Days prior to the date it believes that this Consent Decree will terminate.  If Plaintiff disagrees with the termination date as proposed by Defendant, it may invoke dispute resolution pursuant to Section XI of this Consent Decree.

## XIX. **PUBLIC PARTICIPATION**

1.      This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment, consistent with the procedures set forth in 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding this Consent Decree disclose facts or considerations indicating that this Consent Decree is inappropriate, improper, or inadequate.  Defendant agrees not to oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.  Defendant consents to entry of this Consent Decree without further notice.

## XX. **SIGNATORIES/SERVICE**

1.      The Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, on behalf of the United States, and each undersigned

representative of Defendant, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Decree.

2.      This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

3.      Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.  The Parties agree that the Defendant need not file an answer to the Complaint in this action unless or until this Court expressly declines to enter this Consent Decree.

## XXI.**INTEGRATION**

1.      The Appendices to this Consent Decree are part of this Decree and fully enforceable as if set forth within this Decree.

2.      This Consent Decree and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Decree and supersedes all prior agreements and understandings, whether verbal or written.  No other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXII.**FINAL JUDGMENT**

1.      Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between the United States and Defendant.

2.     The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment.

This Consent Decree is dated and entered this  26th  day of August, 2008

 s/  Julie A. Robinson
UNITED STATES DISTRICT JUDGE
District of Kansas

**Signature Page to Consent Decree in US v. Magellan Pipeline Company, L.P.**

**FOR PLAINTIFF UNITED STATES OF AMERICA**:


_____
Ronald J. Tenpas
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


_____
Elizabeth L. Loeb
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: 202/616-8916
Fax: 202/514-4180

**Signature Page to Consent Decree in US v. Magellan Pipeline Company, L.P.**

**FOR PLAINTIFF UNITED STATES OF AMERICA (continued)**:


_____
XXXXXXXXXXXXXXXXXXXXXXXXX
United States Attorney
District of Kansas


_____
Assistant United States Attorney
District of Kansas
XXXXXXXXXXXXXX

39

**Signature Page to Consent Decree in US v. Magellan Pipeline Company, L.P.**

**FOR PLAINTIFF UNITED STATES OF AMERICA (continued)**:


_____
John Askew
Regional Administrator
U.S. Environmental Protection Agency, Region 7
Kansas City, Kansas



_____
Howard C. Bunch, Esq.
Sr. Assistant Regional
Counsel
U.S. Environmental Protection Agency, Region 7
901 N. 5th Street
Kansas City, Kansas 66101

40

**Signature Page to Consent Decree in US v. Magellan Pipeline Company, L.P.**

**FOR PLAINTIFF UNITED STATES OF AMERICA (continued)**:


_____

GRANTA Y. NAKAYAMA
Assistant Administrator for Office of Enforcement
and Compliance Assurance
U. S . Environmental Protection Agency
Washington, D.C.



_____

Kelly Brantner
Attorney
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
Mail Code 2243A
1200 Pennsylvania Ave., NW
Washington, D.C.  20460

**Signature Page to Consent Decree in US v. Magellan Pipeline Company, L.P.**

**FOR Defendant**

                                       MAGELLAN PIPELINE COMPANY, L.P.
                                       By Magellan GP, LLC, its General Partner
                                       By:_____

42

## ATTACHMENT A 1: LISTED DISCHARGES

| Location | Date |
| --- | --- |
| 1. Wilmington, Illinois | 3/24/1999 |
| 2. Atchison, Kansas | 5/10/1999 |
| 3. Hartland, Iowa | 5/24/1999 |
| 4. Humbolt, Kansas | 8/17/1999 |
| 5. Coralville, Iowa Terminal | 2/5/2000 |
| 6. Sioux Falls/Alexandria, Minnesota | 4/25/00 |
| 7. Fort Smith, Arkansas | 3/21/02 |
| 8. LaHarpe, Kansas | 7/18/2002 |
| 9. Shawnee, Kansas | 10/6/2003 |
| 10. Kansas City, Kansas | 5/23/2005 |
| 11. Independence, Kansas | 1/13/2006 |